```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  06/23/2020
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
: 
ANNETTE SANABRIA ROMERO,                          : 
:        **OPINION & ORDER**
Plaintiff,                : 
:
-against-                          :        18-cv-10248 (KHP)
:
COMMISIONER OF SOCIAL SECURITY,                   :
:
Defendant.               :
:
---------------------------------------------------------------X

Plaintiff Annette Sanabria Romero, represented by counsel, commenced this action

against Defendant Commissioner of the Social Security Administration (the "Commissioner"),

pursuant to Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3),

seeking review of the Commissioner's decision finding that she was not disabled under Sections

216(i) and 223(d) of the Act from December 23, 2014—Plaintiff's amended alleged disability

onset date ("AOD")[1]—through August 22, 2017, the date of the Commissioner's decision.

The parties submitted a joint stipulation in lieu of cross-motions for judgment on the

pleadings pursuant to this Court's order.  (*See* Joint Stipulation at 36, ECF No. 20 (hereinafter,

the "JS").)  Plaintiff appeals the administrative law judge's ("ALJ") decision concerning:  (1)

whether the ALJ fully developed the record; (2) whether Plaintiff's impairments met or equaled

the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"),

specifically Listing 1.04 (Disorders of the spine); (3) whether the ALJ's residual functional

---
[1] Plaintiff's original AOD was August 10, 2014 but it was amended without objection during Plaintiff's hearing.

capacity assessment was supported by substantial evidence; (4) whether the ALJ properly evaluated Plaintiff's subjective complaints; and (5) whether Plaintiff was capable of performing past relevant work.  For the reasons set forth below, the Commissioner's motion is DENIED, and Plaintiff's motion is GRANTED.

## I.   *Procedural History*

Plaintiff filed her initial claim for disability insurance benefits on December 23, 2014. She asserted conditions involving diabetes, her back, right shoulder, right elbow, and bilateral carpal tunnel syndrome as disabling.  She initially claimed an alleged onset date of disability of August 10, 2014 but later amended it to December 2014.  The Commissioner denied Plaintiff's initial application on June 26, 2015.  Plaintiff contested the denial and filed a request for hearing, which was granted.  On June 15, 2017, the Commissioner held a video hearing on Plaintiff's claim.  Plaintiff appeared before ALJ Dennis G. Katz.

Based on the medical records and on Plaintiff's testimony, the ALJ determined Plaintiff's residual functional capacity ("RFC")–the maximum work Plaintiff could do despite her limitations.  Frank Lindner, a vocational expert ("VE") reviewed Plaintiff's past work and testified that she had worked as a residence supervisor, a developmental aid, and a clerk typist. The VE further testified about the classifications and requirements of the jobs.  The ALJ found Plaintiff was not disabled for the purposes of Social Security and denied her application for benefits on August 22, 2017.  Plaintiff appealed to the Appeals Council.  The Appeals Council denied her appeal on September 7, 2018.  The instant case followed.

## II.    *Relevant Background*

Plaintiff was born on March 27, 1964 and currently is 56 years old.  She finished high school and has some college education.  She worked as a residence supervisor in a group home until she stopped working in and around August 2014.  Prior to her work as a residence supervisor, she worked in a clerical capacity at a law firm.  Plaintiff had carpal tunnel surgery on her right hand in 2004, a gastric bypass in 2006, right knee surgery in 2012, a right knee replacement in June 2015, and a revision on the carpal tunnel surgery in December 2016. (*See* Social Security Administrative Record at 268-69, 648, ECF No. 19 (hereinafter, "Tr.").)  As of June 2015, she lived with her husband, three adult children, and two grandchildren.

Plaintiff injured her hand on the job on May 8, 2009.  (Tr. 473.)[2]  On September 24, 2010,[3] she again was injured when she fell at work.  (Tr. 563.)  Two days after the fall, Plaintiff went to St. Luke's Cornwall Hospital and received X-rays on her right shoulder, pelvis, and hips, which, while not revealing any evidence of fractures, showed some degenerative changes of her hips.  (Tr. 628.)  September 28, 2010, Plaintiff went to Dr. Barry Hyman at Orthopedics & Sports Medicine, P.C. ("OSMPC") for an examination, and was diagnosed with a right shoulder contusion and impingement syndrome, and a bilateral hip contusion.  (*See* Tr. 495 (Dr. Martin's December 15, 2014 report noting Dr. Hyman's initial treatment), 628 (Dr. Moga's independent medical examination report detailing Plaintiff's treatment history).)  From this visit through March 2017, Plaintiff saw multiple doctors at OSMPC for her various impairments, including: Dr. Enrique Sanz, a specialist in physical medicine, rehabilitation, and pain management; Dr.

---

[2] Other reports in the record indicate she was actually injured on June 6, 2005.  (*See* Tr. 705.)
[3] Some notes in the same medical report, as well as elsewhere in the administrative record, indicate she was actually injured on August 24, 2010.

Gina Del Savio, an orthopedic hand surgery; Dr. Esteban Cuartas, an orthopedic spine surgeon; and Dr. Wasik Ashraf, an orthopedic surgeon.  Plaintiff also saw the following doctors during the course of her treatment who were not affiliated with OSMPC:  Dr. Rita Figueroa, the consultative examiner in this case; Dr. John A. McClaughlin, a surgeon with Orthopedic Associates of Dutchess County, who performed a full right knee replacement on Plaintiff; and Dr. Jerome Moga, another orthopedic specialist who conducted an independent medical examiner evaluation for workers' compensation purposes.  Because many of these doctors who treated Plaintiff—particularly those at OSMPC—could be treating physicians, the Court will review the examinations and treatments of these doctors in detail, on a doctor by doctor basis.

### Dr. Enrique Sanz

Plaintiff saw Dr. Sanz, a pain management specialist, from January 30, 2012 through March 31, 2017, on at least twelve separate occasions.  During these visits, Dr. Sanz consistently found that Plaintiff's chief complaints—all of which stemmed from incidents at work and which varied from visit to visit, but always centered on her lumbar spine and right side—were well founded and recommended treatments ranging from pain medication to caudal epidural injections.

On January 30, 2012, Dr. Sanz examined and treated Plaintiff, noting that Plaintiff's symptoms worsened despite seemingly having received a lumbar (caudal) epidural steroid injection, but that Plaintiff agreed to try a second such injection.  (Tr. 530.)[4]  Dr. Sanz also recommended Plaintiff alter her activities, as she could tolerate them, to avoid injury and pain.

---

[4] It is unclear from the record when the first injection occurred or whether Dr. Sanz, or some other OSMPC doctor, prescribed the injection.  It is also unclear from the record if this was Plaintiff's first visit with Dr. Sanz.

(Tr. 530.)  Dr. Sanz then opined that Plaintiff had 25% temporary impairment, also noting she was working full time.  (Tr. 530.)

On September 21, 2012, Dr. Sanz repeated his observations from January regarding Plaintiff's worsening condition.  (Tr. 423).  Dr. Sanz additionally prescribed Voltaren Gel, an anti-inflammatory cream, which was to be applied to Plaintiff's affected area.  (Tr. 423.)  Dr. Sanz also recommended use of a lumbar brace.  (Tr. 423.)  Dr. Sanz noted a 25% temporary impairment and that Plaintiff was working full time.  (Tr. 423.)

On April 4, 2013, Dr. Sanz examined and treated Plaintiff, noting the condition had been unchanged since the previous visit, despite receiving the second injection, and that Plaintiff still reported "radicular pain into her LE."  (Tr. 291.)  Dr. Sanz recommended, and Plaintiff agreed to, a third injection,[5] while also continuing to recommend Plaintiff adjust her activities to avoid injury and pain.  (Tr. 291.)  Dr. Sanz's diagnoses during this visit were herniated disc-lumbar, low back pain, and lumbar radiculitis, leading Dr. Sanz to opine Plaintiff had a 25% temporary disability.  (Tr. 291-92.)  This examination of Plaintiff was then used by Dr. Sanz to fill out a Doctor's Narrative Report for Plaintiff's workers' compensation claims.  (Tr. 287-88.)

Plaintiff again visited Dr. Sanz on October 30, 2013.  (Tr. 282-85.)  Despite having recommended an additional injection, and being approved for it shortly after the April visit, Plaintiff informed Dr. Sanz that on "the day of the appointment she was not called in." (Tr. 284.)  Dr. Sanz noted that he would follow up with workers' compensation and additionally

---

[5] For simplification, the Court will refer to the injections recommended by Dr. Sanz and received by Plaintiff as first, second, third, etc., and not the first or second of a given series, as done in Dr. Sanz's medical reports in the administrative record.  (*See, e.g.*, Tr. 295 ("Lumbar epidural-caudal approach (First in a series of three)").)

prescribed Plaintiff Tramadol.  (Tr. 284.)  Dr. Sanz also noted that Plaintiff ambulated normally, had full strength in her muscles, but was still 25% temporarily impaired.  (Tr. 282-84.)

On August 4, 2014, Dr. Sanz again examined and treated Plaintiff.  Dr. Sanz noted that Plaintiff's condition had worsened because "she hasn't been taking her medication (Tramadol and Voltaren Gel)" and that despite receiving another injection, Plaintiff "only obtained less than 2 weeks [of] pain relief [and] reported radicular symptoms."  (Tr. 544.)  In addition to the three diagnoses from the August 2013 report, Dr. Sanz added a diagnosis for lumbar spinal stenosis, also observing that Plaintiff had both a normal and antalgic gait.  (Tr. 543-44.)  In the discussion section of his report, Dr. Sanz noted that Plaintiff informed him it was becoming increasing difficult to continue working.  (Tr. 544.)  Dr. Sanz further noted that workers' compensation "has yet to give her the prescriptions for the Volt[a]ren Gel and Tramadol," that he would write new ones for her, and that she now was using a cane for her lumbar issues. (Tr. 544.)  Again, Dr. Sanz opined that Plaintiff had 25% temporary impairment and noted that Plaintiff was working full time, full duty.  (Tr. 544.)  Dr. Sanz also observed that Plaintiff had full muscle strength, negative straight-leg raise tests, and that her thoracolumbar/sacral spine "[r]ange of motion is normal with pain upon flexion and extension," particularly on the right side.  (Tr. 544.)

At Plaintiff's September 5, 2014 follow-up visit, Dr. Sanz noted that despite his prior observation that Plaintiff's condition was worsening as a result of her failure to take the prescribed medications, her pain remained during this examination even with Plaintiff taking her prescribed medicine.  (Tr. 280.)  Dr. Sanz again noted both antalgic and normal gaits. (Tr. 279.)  Further, Dr. Sanz noted that Plaintiff had begun her physical therapy and that he

6

would schedule her for another injection.  (Tr. 281.)  Dr. Sanz continued to instruct Plaintiff to

alter her actives to avoid injury and pain.  (Tr. 281.)  Finally, Dr. Sanz now noted that Plaintiff

had a 100% temporary impairment and had not worked since August 10, 2014.  (Tr. 281.)

Further, Dr. Sanz noted that Plaintiff began to receive unemployment benefits and was

attempting to find a job in a clerical capacity.  (Tr. 281.)

On June 29, 2016, Plaintiff underwent an MRI, specifically, for diagnostic imagining of

her lumbar spine, as ordered by Dr. Sanz.  (Tr. 688.)[6]  The imaging and subsequent report were

signed by Dr. Lawrence Cicchiello.  (Tr. 688.)  The MRI revealed several issues:  degenerative

disc and facet joint changes of the lower lumbar spines, annular tear and disc bulge at L4-L5

with facet arthropathy and ligamentum hypertrophy causing cervical canal stenosis and mild

bilateral neural foraminal narrowing, as well as a small disc bulge at L5-S1 without spinal

stenosis.  (Tr. 690.)

On November 30, 2016, Plaintiff visited Dr. Sanz again, complaining of pain in her

lumbar spine that radiated into the right hip and both legs.  (Tr. 680-83.)  Dr. Sanz observed

that Plaintiff had an antalgic gait and was pitched forward, but had full range of motion in her

spine and neck.  However, Dr. Sanz also noted tenderness in both sides of the paraspinal

musculature with a decreased range of motion with pain upon flexion and extension.  (Tr. 682.)

Both straight-leg raises were negative.  (Tr. 682.)  Dr. Sanz went on to note that Plaintiff's

symptoms were unchanged despite taking various medications and applying the anti-

inflammatory gel, and that the injections Plaintiff received did not have long-lasting pain-relief

---

[6] The record does not appear to contain any indication as to when Dr. Sanz ordered this MRI, but the diagnostic report for this MRI clearly indicates Dr. Sanz was the referring doctor.  (Tr. 688.)

effects.  (Tr. 682-83.)  Dr. Sanz diagnosed Plaintiff with radiculopathy of the lumbar region,

spinal stenosis of the lumbar region, and other intervertebral disc degeneration of the lumbar

region and opined that Plaintiff had 50% temporary impairment.   (Tr. 682-83.)

Plaintiff saw Dr. Sanz on March 31, 2017, which is also the most recent record note in

Plaintiff's medical history.  (Tr. 666-69.)  Dr. Sanz opined that Plaintiff had 50% temporary

impairment.  Dr. Sanz assessed Plaintiff with radiculopathy of the lumbar region, spinal stenosis

of the lumbar region, other intervertebral disc degeneration of the lumbar region, and sprain of

ligaments of the lumbar spine sequela.  (Tr. 669.)  Plaintiff was observed walking with a normal

gait and had full muscle strength.

### Dr. Esteban Cuartas

Another doctor at OSMPC with whom Plaintiff has significant treatment history is Dr.

Esteban Cuartas, an orthopedic spinal specialist.  Plaintiff first saw Dr. Cuartas in July 2011 for

what appeared to be a one-off visit.  However, Plaintiff then revisited Dr. Cuartas on December

9, 2014, and continued to see him on at least five other occasions, ending with a February 1,

2017 visit.  Generally speaking, in examining and treating Plaintiff, Dr. Cuartas observed

significant impairments in Plaintiff's back and shoulder, rendered several diagnoses for each

respective area, and recommended mainly non-surgical management.  Dr. Cuartas also filled

out two Doctor's Narrative Reports for Plaintiff's workers' compensation claims, on August 22,

2011 and December 19, 2014.  (Tr. 317, 352.)

At Plaintiff's first visit with Dr. Cuartas, dated July 14, 2011, it appears that the first MRI

after Plaintiff's slip and fall on her back was reviewed with Plaintiff.  (Tr. 322.)  The radiology

report from this examination indicates that Plaintiff had issues with her L4-5 and L5-S1 discs.

(Tr. 322.)[7]  Dr. Cuartas diagnosed Plaintiff with the following four impairments:  lumbar degenerative disc disease, lumbar strain, herniated disc-lumbar, and lumbar spinal stenosis. (Tr. 322.)  Further, Dr. Cuartas opined Plaintiff had a 25% temporary impairment, and was working full time, full duty.  (Tr. 322.)

Several months later, Dr. Cuartas filled out a Doctors' Narrative Report, dated August 22, 2011, for workers' compensation purposes.  (Tr. 317.)  In that report, he diagnosed Plaintiff with the following three conditions:  displacement of the lumbar disc without myelopathy, spinal stenosis of lumbar region, and lumbar (ICD9 Code 847.2).  (Tr. 317.)  Dr. Cuartas also opined that Plaintiff had a 25% impairment.

Plaintiff's next visit with Dr. Cuartas occurred on December 19, 2014, after Dr. Mikhail Itingen, also of OSMPC, recommended to Plaintiff a follow-up "in 1 week with Dr. Cuartas, our spine specialist to discuss possible surgical intervention."  (Tr. 554.)  At the December 2014 visit, Plaintiff complained of the same issue from her July 2011 visit, which was pain in her left lower back radiating down the side of both legs.  (Tr. 353.)  Dr. Cuartas noted that Plaintiff's symptoms had worsened, with the Plaintiff's reported pain scale being at ten of ten (for context, Plaintiff reported a six at her July 2011 meeting), despite having received injections from Dr. Sanz since Dr. Cuartas last examined Plaintiff.  (Tr. 353.)  Dr. Cuartas opined that the axial back pain Plaintiff experienced was "most likely related to disc herniation and nerve root impingement, [and] canal stenosis . . . ."  (Tr. 356.)  As such, Dr. Cuartas maintained three of the prior diagnoses from the 2011 visit, but changed his diagnosis of "lumbar" to "[l]ow back pain."

---

[7] As indicated in the Radiology Report section of the Office Note, Dr. Prakash Patel signed this section of the report, dated July 6, 2011.

9

(Tr. 356.)  Dr. Cuartas then opined that Plaintiff had 100% temporary impairment and was not currently working.  Dr. Cuartas prescribed physical therapy two to three times per week for eight weeks.  (Tr. 356.)

On March 25, 2015, Plaintiff returned to Dr. Cuartas for another evaluation, complaining of the same back pain radiating to her legs.  (Tr. 398.)  Plaintiff again reported severe pain, this time at nine out of ten, with Dr. Cuartas noting sharp pain as well.  (Tr. 398.)  Dr. Cuartas then opined that Plaintiff had two current conditions:  lumbar degenerative disc disease and lumbar spinal stenosis.  (Tr. 400.)  Dr. Cuartas then noted, in the workers' compensation section, that Plaintiff's current status was "[d]isability retirement."  (Tr. 400.)

Despite the prior treatments on Plaintiff's right shoulder, which consisted primarily of physical therapy and injections, she still experienced increased pain in her right shoulder.  (Tr. 694.)  On January 19, 2016, Plaintiff had a visit with Dr. Cuartas to examine her shoulder, as opposed to just her lower back and legs.  (Tr. 694.)  Dr. Cuartas noted Plaintiff's prior care with Drs. Hyman and Uhorchak,[8] also noting that an injection had helped Plaintiff since her last visit (the date of which is unclear).  (Tr. 694.)  The examination of Plaintiff's right shoulder revealed several issues, such as mild swelling and moderate tenderness at the trapezius and surrounding area and extreme pain during abduction tests, including a positive cross adduction AC test. (Tr. 695.)  Dr. Cuartas then diagnosed her with primary osteoarthritis of the right shoulder and an unspecified sprain of right shoulder joint, instructing Plaintiff to continue taking the prescription anti-inflammatories, and ordering an MRI (to be approved by workers'

---

[8] Dr. Uhorchak was another doctor at OSMPC who examined Plaintiff on at least one occasion.

compensation).  (Tr. 696.)  While Dr. Cuartas's impression was that the symptoms for this impairment were worsening, Dr. Cuartas did not note the percentage of temporary disability he believed the impairment caused Plaintiff.  (Tr. 696.)

On October 22, 2016, Plaintiff underwent an MRI, specifically, for diagnostic imaging of her pelvis, that Dr. Cuartas ordered.  (Tr. 685.)  The imaging and subsequent report were signed by Dr. Steven Shanon.  (Tr. 687.)  The MRI revealed several issues:  moderate bilateral hip arthrosis, joint space narrowing and osteophytes, degenerative changes in lower lumbar spine, mild chronic appearing sacroiliac joint arthrosis, and phleboliths throughout pelvis.  (Tr. 686-87.)

On February, 1, 2017, Plaintiff saw Dr. Cuartas, complaining of pain in the lower back radiating to Plaintiff's right hip and leg.  (Tr. 671-73.)  Dr. Cuartas diagnosed Plaintiff with spinal stenosis of the lumbar region, unilateral primary osteoarthritis of the right hip, and osteoarthritis of the hip.  (Tr. 672.)  Dr. Cuartas also noted that Plaintiff's symptoms were moderate but that she had axial back pain.  (Tr. 673.)  Plaintiff was observed ambulating without assistance.  (Tr. 673.)  Dr. Cuartas opined that Plaintiff had 50% temporary impairment and recommended a follow-up examination in eight weeks with Dr. Sanz.[9]  (Tr. 673.)

**Dr. Gina Del Savio**

Plaintiff saw Dr. Gina Del Savio, a specialist in orthopedic hand surgery, for pain she was having in her right elbow as the result of another incident at work.[10]  (Tr. 513.)  Plaintiff saw Dr.

---

[9] Dr. Sanz saw Plaintiff next on March 31, 2017.

[10] As described in Dr. Del Savio's report, the incident "[o]curred while trying to get the client out of the hospital, the client was in a wheel chair when she started to become aggressive, which made the patient grab onto the clients chest to stop her from falling out, when the client attacked the patients right hand and the patient tried to pull away."  (Tr. 512.)

Del Savio at least four times regarding problems she was having, initially with her right upper extremities (i.e. hand and elbow), between June 2013 and February 2015.

During the first examination on June 10, 2013, Dr. Del Savio noted that while Plaintiff had full right elbow strength and range of motion, the motion was with pain, there was "moderate tenderness at the lateral epicondyle," and there was "increased pain to the lateral elbow with resisted wrist extension with the elbow extended." (Tr. 513.) As such, Dr. Del Savio diagnosed Plaintiff with right lateral epicondyle tendonitis, recommending a treatment of therapy, bracing, and anti-inflammatories, with cortisone injections as an alternative option should the initial treatment not work. (Tr. 513-14.) Dr. Del Savio then opined that Plaintiff had a 0% temporary impairment and was working full time. (Tr. 514.)

On December 22, 2014, Plaintiff again visited Dr. Del Savio, this time complaining of aching, numbness, tingling, and cramping in her right hand. (Tr. 344.) At the outset, Dr. Del Savio noted that the Voltaren Gel and Tramadol Plaintiff was taking for her back helped a little with her hand, and that Plaintiff had undergone right carpal tunnel release surgery in 2004. (Tr. 344.) After examining Plaintiff's right wrist, Dr. Del Savio noted that there was "moderate tenderness at the dorsal aspect of the radiocarpal joint," there was a full range of motion but with pain, normal grip strength, the Axial Grind Test was positive for ulnar deviation, and the Lunotriquetral Shuck and Scapholunate Shuck tests were positive. (Tr. 345.) After examining Plaintiff's right hand, Dr. Del Savio noted there was "[m]oderate atrophy" at the thenar eminence, median nerve compression, positive signs of carpal tunnel syndrome, but had normal sensation and normal grip strength. (Tr. 345.) As a result of these observations, Dr. Del Savio ordered two tests: an EMG/NCV bilateral upper extremities test and a carpal tunnel

syndrome test.  (Tr. 345.)  Dr. Del Savio then opined that Plaintiff had 25% temporary disability and was neither currently working or employed.  (Tr. 345.)

On January 16, 2015, Dr. Donna Flynn evaluated the diagnostic testing ordered by Dr. Del Savio of Plaintiff's hands, but did not examine Plaintiff.  (Tr. 643-46.)  Dr. Flynn opined that Plaintiff had mild bilateral carpal tunnel syndrome and mild right cubital tunnel syndrome. (Tr. 643.)

On February 3, 2015, Plaintiff returned to Dr. Del Savio, but this time for issues related to her back, and not her hands.  (Tr. 594-96.)  After reviewing Plaintiff's treatment history and examining Plaintiff, Dr. Del Savio noted that Plaintiff's symptoms were largely unchanged relative to the notes from previous OSMPC doctors—but did note an abnormal gait and station—instructing her to continue modifying activities to avoid pain and injury, and to continue with her physical therapy.  (Tr. 596.)  Dr. Del Savio then opined on Plaintiff's work status, noting that she should not work until the next evaluation in eight weeks and that Plaintiff had 100% temporary impairment.  (Tr. 596.)

On February 26, 2015, Plaintiff visited with Dr. Del Savio to review the results of the diagnostic tests done by Dr. Flynn.  (Tr. 395.)  At this visit, Plaintiff also informed Dr. Del Savio that while the Voltaren Gel and Tramadol had been helpful, she was still experiencing significant pain, numbness, and weakness in her right hand.  (Tr. 395.)  Dr. Del Savio found that Plaintiff was "[f]unctioning well with minimal symptoms" in connection with her carpal tunnel syndrome.  (Tr. 397.)  However, Dr. Del Savio nonetheless maintained her opinion from earlier in the month of a 100% temporary impairment.  (Tr. 397).  Dr. Del Savio further recommended continued use of a brace and non-surgical treatment options.  (Tr. 397.)

13

**Dr. Eric Martin**

Plaintiff saw Dr. Eric Martin, another orthopedic specialist, on at least two occasions, once in 2012 and once in 2014, over the course of her disability examinations and treatments.

On December 28, 2012, Plaintiff visited OSMPC, to be evaluated and treated by Dr. Martin due to pain in the right hip as the result of the slip and fall from September 2010. (Tr. 563-66.)  Dr. Martin observed that Plaintiff had previously seen Dr. Hyman, who, in observing and treating Plaintiff shortly after the slip and fall, focused mainly on her back. (Tr. 563.)  The chief complaint noted in Dr. Martin's report, however, was "[p]ain in the right hip," which Dr. Martin recorded as severe (nine out of ten on the pain scale) with worsening symptoms.  (Tr. 563.)  For treatment, Dr. Martin noted that he discussed cortisone injections as a possible option to manage the condition, but ultimately recommended continuing with a "home exercise program."  (Tr. 565.)  Finally, Dr. Martin noted a "10% temporary impairment relatable to the hip, right," with a follow-up recommendation of "[r]eturn PRN[11] recurrence or worsening."  (Tr. 565.)

On December 15, 2014, Plaintiff had another examination with Dr. Eric Martin.  (Tr. 495-98.)  After examining Plaintiff and noting that Plaintiff was not improving, Dr. Martin discussed with Plaintiff operative and conservative management treatments and that the decision was made to "go with non-surgical management at this time."  (Tr. 497.)  Dr. Martin opined that Plaintiff had 10% temporary impairment, was not currently working, was able to walk without assistance but had an antalgic gait, and had normal range of motion in her back.  (Tr. 497-98.)

---

[11] PRN is an acronym for the Latin phrase, "pro re nata," which, as used in the medical field, means as needed. Thus, a recommendation of PRN means the patient should return "as needed" given the complained of condition.

Finally, Dr. Martin prescribed anti-inflammatory cream as well as physical therapy, two to three times per week for four weeks.  (Tr. 497.)

### Dr. Jerome Moga

As part of the Workers' Compensation Board process, New York State Insurance Fund's Jesse Abraham made a request to Dr. Jerome Moga to conduct an Independent Medical Examination of Plaintiff.  (Tr. 662.)  Dr. Moga conducted the requested examination on January 23, 2015, and issued a report, dated February 3, 2015.  (Tr. 654-58.)  During the examination Dr. Jerome Moga observed that there was tenderness to Plaintiff's right trapezius muscle area and numbness to pinpricks of the lower extremities.  (Tr. 656.)  Further, Dr. Moga's exam showed a positive straight-leg raising test for both legs (70 degrees right, 90 degrees left) but did not indicate if the straight-leg raising test was sitting, supine, or both.  Plaintiff had no numbness in her hands and had right grip strength of 25 pounds and left grip strength of 36 pounds.  (Tr. 656.)  At the conclusion, Dr. Moga diagnosed Plaintiff with lumbar herniated disc syndrome, right shoulder contusion and impingement syndrome, and right hip contusion, which he opined were all casually related to Plaintiff's September 24, 2010 slip and fall accident.  (Tr. 657.)  Dr. Moga then recommended continued physical therapy at three time a week for four weeks, with an extension for an additional four weeks if Plaintiff showed improvement.  (Tr. 657.)

### Dr. Rita Figueroa

On June 5, 2015, Dr. Rita Figueroa performed a consultative examination of Plaintiff in connection with her application for Social Security benefits—this was the only time Dr. Figueroa ever examined Plaintiff.  (Tr. 647-51.)  In her activities of daily living, Plaintiff claimed

she does not cook because she cannot stand long enough, that she does light dusting once a week, and that she cannot do laundry because there are stairs involved.  (Tr. 648-49.)  Plaintiff stated that she shopped one to three times a week and watches television.  (Tr. 648-49.)  She claimed that she could take care of her personal hygiene and was generally able to dress herself.  (Tr. 648-49.)  Dr. Figueroa observed that Plaintiff had a normal gait, did not have difficulty getting on and off the exam table, and was able to rise from a chair without difficulty. (Tr. 649.)  Dr. Figueroa noted that Plaintiff did not use an assistive device.  (Tr. 649.)  Plaintiff had negative straight-leg raise tests bilaterally but had limited flexion in her cervical and lumbar spine.  (Tr. 650.)  Plaintiff had full strength in her extremities bilaterally, and there was no muscle atrophy.  (Tr. 650.)  Dr. Figueroa diagnosed Plaintiff with, *inter alia*, chronic neck pain, right elbow tendonitis, bilateral carpal tunnel syndrome, chronic back pain, lumbar radiculopathy, and right knee arthritis.  (Tr. 650-51.)  Dr. Figueroa opined that Plaintiff "has a marked limitation for repetitive kneeling, squatting, and crawling . . . mild limitation for pushing and pulling . . . [and] moderate limitation for lifting, carrying, and repetitive bending."  (Tr. 651.)

**Dr. John A. McLaughlin**

On June 23, 2015, Plaintiff had a right total knee arthroplasty performed by Dr. John A. McLaughlin to treat osteoarthritis of the knee.  (Tr. 388-89.)  The post-operation report indicates there were no complications.  (Tr. 389.)  While no report(s) exists in the record, it seems Dr. McLaughlin had previously seen Plaintiff for her arthritic knee, recommending treatments of anti-inflammatories, activity modifications, and cortisone injections, but noting in the pre-operation report, dated June 22, 2015, that these treatments did not stop the progressive worsening of her right knee.  (Tr. 69); (*see also* Tr. 369 (February 11, 2015 visit with

16

Dr. McClaughlin in which physical examination and imaging review led to conclusions of "significant effusion" in right knee and "increased signal intensity on the lateral meniscus . . . [and] [f]airly significant degenerative changes").)

**Dr. Wasik Ashraf**

Dr. Wasik Ashraf, an orthopedic surgeon with OSMPC, examined and treated Plaintiff at least twice toward the end of the relevant medical record.  Generally, Dr. Ashraf observed the worsening condition of Plaintiff's hips (primarily the right hip, but Dr. Ashraf noted issues with both hips) and ordered physical therapy and other non-surgical management options.

On November 9, 2016, at the request of Dr. Cuartas, Plaintiff had a consultation with Dr. Ashraf.  (Tr. 732.)  At the outset of Dr. Ashraf's report, he noted that there were two different workers' compensation injuries Plaintiff was dealing with—the September 24, 2010 slip and fall and a June 6, 2005 incident involving turning a patient in their bed—that had been combined, and noted Plaintiff's treatment history with the various doctors of OSMPC. (Tr. 732.)[12]  During the examination, Dr. Ashraf observed that Plaintiff had a normal gait but had a limp on her right side.  (Tr. 734.)  She had complete motor strength in both of her hips, though, for her right hip, she had moderate decreased motion with pain on the extremes of hip motion and pain with hip flexion and abduction against resistance.  (Tr. 735.)  Dr. Ashraf also noted that Plaintiff's right knee arthroplasty incision was clean, dry, and intact, though there was some swelling.  (Tr. 735.)  Dr. Ashraf observed that Plaintiff could get out of her chair

---

[12] The discussion of the medical history included the following phrase:  She was initially treated by myself in 2010. Upon further examination of the medical record, it appears this note was entered by Dr. Hyman after treating Plaintiff in the days following her slip and fall accident in September 2010.  Subsequent OSMPC doctors who examined and treated Plaintiff added their notes to preexisting ones, resulting in misleading uses of pronouns.

easily. (Tr. 736.) Ultimately, Dr. Ashraf assessed Plaintiff with unilateral primary osteoarthritis

of both hips and the presence of a right artificial knee joint. (Tr. 736.) Dr. Ashraf further noted

that non-surgical management of the impairments was decided upon, and that he

recommended Plaintiff begin physical therapy two to three times per week for four weeks, with

Plaintiff to be reexamined at the conclusion of those four weeks. (Tr. 736.) Finally, Dr. Ashraf

opined that Plaintiff had a 50% temporary impairment. (Tr. 736.)

On February 3, 2017, Plaintiff visited Dr. Ashraf, largely to review the results of an MRI

performed on January 27, 2017, focused on her hip issues. (Tr. 705.) Dr. Ashraf noted that

Plaintiff's right hip pain was sharp and had been worsening for the past several months.

(Tr. 707.) As such, the MRI revealed a litany of issues with Plaintiff's hips: mild right hip

arthrosis including labral tear, chondral loss, small bone spurs and slight synovitis; convexity of

lower lumbar spine towards left and degenerative changes within lower lumbar spine; mild left

hip arthrosis; mild/moderate hypertrophy; bilateral hamstring tendinopathy; bilateral gluteal

tendinopathy; trochanteric bursitis; complex left adnexal lesion. (Tr. 707-08.) She was

assessed as having unilateral primary osteoarthritis of the right hip. Dr. Ashraf recommended

physical therapy, with a follow-up in six weeks, and opined that Plaintiff had a 50% temporary

impairment. (Tr. 708.)

### III.   *The Commissioner's Decision*

In rendering his decision, the ALJ first determined that Plaintiff met the insured status

requirement under the Social Security Act through December 31, 2020. (Tr. 17-18.) He then

applied 20 C.F.R. § 404.1520 (a)(4)'s five-step sequential process to evaluate Plaintiff's claim.

(Tr. 18-25.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful

18

activity since her AOD, December 23, 2014.  (Tr. 19.)  At step two, the ALJ concluded that

Plaintiff suffered from the following severe impairments:  upper extremity impairments,

obesity, and knee impairments.  (Tr. 19.)  The ALJ did not state whether he viewed Plaintiff's

diabetes or back conditions to be severe (which she mentioned in her application); nor did he

comment on her hip and knee conditions (which are reflected in the medical record).

        At step three, the ALJ found that Plaintiff's impairments, individually and collectively,

failed to meet or equal the severity of the impairments in Listings 1.02 (major dysfunction of a

joint(s) (due to any cause)), 1.03 (reconstructive surgery or surgical arthrodesis of a major-

weight bearing joint), "or any other listings in the 20 CFR Part 404, Subpart P, Appendix 1."

(Tr. 19-20.)  The ALJ also noted that he considered the effect of Plaintiff's obesity in

combination with Plaintiff's underlying impairments, but the ALJ "concluded that the

[Plaintiff's] impairments, either singly or in combination, do not satisfy the clinical criteria" of

any of the Listings.  (Tr. 19.)

        At step four, the ALJ assessed Plaintiff's RFC.  (Tr. 20-24); *see also* 20 C.F.R.

§ 404.1520(e).  The ALJ found that, through the hearing date, Plaintiff had the RFC to perform

"light work" as defined in 20 C.F.R. § 404.1567(b), subject to certain limitations.[13]  (Tr. 20.)

These restrictions included limitations on the amount she could stand and/or walk, as well as

lifting a maximum of 20 pounds occasionally and 10 pounds frequently,[14]  and performing

---

[13] Light work is defined as "work involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b)

[14] "Occasionally" and "frequently" are terms of art under Social Security regulations.  *See Rivera v. Comm'r of Soc. Sec.*, 394 F. Supp. 3d 486, 496 (S.D.N.Y. 2019) (citing *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003)).

"frequent reaching, handling, and fingering." (Tr. 20.)  Relying on the testimony of the VE, the

ALJ found that Plaintiff could perform her past relevant work as a clerk typist and residence

supervisor, both of which are sedentary positions requiring frequent reaching, handling, and

fingering. (Tr. 24-25.)  The ALJ made this finding against the extensive medical history,

including several from treating physicians who, in the workers' compensation context,

consistently opined that Plaintiff was temporarily disabled, up to 100%.  Nonetheless, the ALJ

held that Plaintiff was not disabled as of December 23, 2014, the AOD, through the date of the

decision. (Tr. 25.)

### DISCUSSION

### I.   *Applicable Law*

#### A.   *Judicial Standard of Review of the Commissioner's Decision*

A court's review of the Commissioner's denial of disability benefits is limited to two

inquiries. *See Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987); *Dwyer v. Astrue*, 800 F. Supp.

2d 542, 546 (S.D.N.Y. 2011).  The court must determine whether the Commissioner applied the

correct legal principles in reaching a decision and whether the Commissioner's decision is

supported by substantial evidence in the record.  *See* 42 U.S.C. § 405(g); *Estrella v. Berryhill*, 925

F.3d 90, 95 (2d Cir. 2019).  If the Commissioner's decision is supported by substantial evidence

in the administrative record, the ALJ's findings as to any facts are conclusive.  42 U.S.C.

§§ 405(g) & 1383(c)(3).

---

Occasionally means "very little up to one-third of the time."  SSR 83-14.  Frequently means "from one-third to two-thirds of the time."  *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error if that failure may have affected the disposition of the case. *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statute, regulation, or Social Security Ruling ("SSR"). *See, e.g.*, *id.* (discussing failure to follow a regulation); *Schaal v. Callahan*, 993 F. Supp. 85, 93 (D. Conn. 1997) (discussing failure to follow SSR). In such a case, the court may remand the matter under sentence four of 42 U.S.C. § 405(g), especially if necessary to allow the ALJ to develop a full and fair record or to explain his reasoning. *See, e.g.*, *Donnelly v. Colvin,* No. 13-cv-7244 (AJN) (RLE), 2015 WL 1499227, at *8 (S.D.N.Y. Mar. 31, 2015); *Rivera ex rel. S.M.H. v. Colvin,* 9 F. Supp. 3d 309, 316 (S.D.N.Y. 2014).

If the reviewing court is satisfied that the ALJ applied the correct legal standards, it must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citation and internal quotation marks omitted); *Donnelly*, 2015 WL 1499227, at *8. The threshold is not high. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). If the decision applies the correct legal standards and is based on substantial evidence, the reviewing court must affirm; otherwise, the court may modify or reverse the decision, with or without remand. 42 U.S.C. §§ 405(g) & 1383(c)(3).

### B. Legal Principles Applicable to the Commissioner's Disability Determination

Under the Act, every individual considered to have a "disability" is entitled to benefits. 42 U.S.C. §§ 423 & 1382. The Act defines "disability" as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  A claimant's impairments must be "of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B).

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following sequential five-step inquiry:

(1) Determine whether the claimant is currently engaged in any substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).

(2) If not gainfully employed, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to perform basic work activities. Under the applicable regulations, an impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities is considered "severe."  20 C.F.R. § 404.1520(c).

(3) If the claimant has a "severe impairment," determine whether the impairment is one of those in the Listings – if it is, the Commissioner will presume the claimant to be disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  The Commissioner must also determine the claimant's ability to perform physical and mental work activities on a sustained basis despite his impairments, the RFC.[15]  20 C.F.R. § 404.1520(a)(4)(iv).

(4) If the claimant does not meet the criteria set forth in the Listings, the Commissioner next must determine whether the claimant possesses the requisite RFC to perform past work.  *Id.*

(5) If the claimant is not capable of performing work performed in the past or has no history of past work, the Commissioner

---

[15] A claimant's RFC is "the most [he] can still do despite [his] limitations."  20 C.F.R. § 404.1545(a)(1).  The ALJ's assessment of a claimant's residual functional capacity must be based on all relevant medical and other evidence, including objective medical evidence, such as X-rays and MRIs, the opinions of treating and consultative physicians, and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities.  *See, Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

22

> must determine whether the claimant can perform other
> substantial gainful work which exists in the national economy.

*Id.*; 42 U.S.C. § 1382c(a)(3)(B); *see also*, *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir.

1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999).

The claimant bears the burden of proof at the first four steps of the

Commissioner's analysis.  *See Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013);

*Gonzalez*, 61 F. Supp. 2d at 29.  At the last step, the Commissioner has the burden to

show that "there is other gainful work in the national economy which the claimant could

perform."  *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998); *see Poupore v. Astrue*, 566

F.3d 303, 306 (2d Cir. 2009).

### C.  Legal Principles Applicable to Development of the Record and Treating Physicians

In Social Security proceedings, the ALJ must affirmatively develop the record on behalf

of all claimants, including those represented by counsel.  *See Moran v. Astrue*, 569 F.3d 108,

112-13 (2d Cir. 2009); *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  This duty exists because

social security proceedings are "essentially non-adversarial."  *Shafer v. Colvin*, No. 16-cv-7941

(LAP) (SDA), 2018 WL 4233812, at *7 (S.D.N.Y. Feb. 15, 2018), *report and recommendation*

*adopted*, No. 16-cv-7941 (LAP) (SDA), 2018 WL 4232914 (S.D.N.Y. Sept. 4, 2018)).  Further, this

duty has particular importance for the treatment of a plaintiff's treating physician(s):

> "The duty to develop the record is even more important when the information
> concerns a claimant's treating source.  *See Ulloa [v. Colvin*, No. 13-cv-4518 (ER),]
> 2015 WL 110079, at *11 [(S.D.N.Y. Jan. 7, 2015)] (citation omitted).  This is because
> treating sources "are likely to be the medical professionals most able to provide a
> detailed, longitudinal picture of [a claimant's] medical impairment(s) and may
> bring a unique perspective to the medical evidence that cannot be obtained from
> the objective medical findings alone or from reports of individual examinations."

23

> *Marinez v. Comm'r of Soc. Sec.*, 269 F. Supp. 3d 207, 216 (S.D.N.Y. 2017) (citing 20
> C.F.R. § 416.927(c)(2) ).  Thus, the ALJ's duty to develop the record is "inextricably
> linked" to the treating physician rule, which requires controlling weight be given
> to the opinion of a claimant's treating physician when it is supported by accepted
> diagnostic techniques and not inconsistent with other evidence in the record.
> *Lacava v. Astrue*, No. 11-cv-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y.
> Nov. 27, 2012), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y.
> Dec. 19, 2012); *see also* 20 C.F.R. § 404.1527(c)(2)."

*Id.*  To satisfy this duty, an ALJ should have medical evidence from treating physicians opining

on the "existence and severity of a disability"—a record containing only treating physicians' raw

data or medical notes is an insufficient record upon which an ALJ can substantiate an RFC, and

requires the ALJ to seek the treating physicians' actual functional opinions.  *See id.* (citing *Barrie*

*on behalf of F.T. v. Berryhill*, No. 16-cv-5150 (CS) (JCM), 2017 WL 2560013, at *10 (S.D.N.Y. June

12, 2017)); *see also Gavazzi v. Berryhill*, 687 F. App'x 98, 100 (2d Cir. 2017) ("In analyzing a

treating physician's report, 'the ALJ cannot arbitrarily substitute his own judgment for

competent medical opinion.'") (quoting *Rosa*, 168 F.3d at 79 (2d Cir. 1999)).  When the record

does not contain a treating physicians' opinion(s) on the plaintiff's functional capacity (i.e. an

RFC), the duty "requires that he *sua sponte* request" that opinion.  *Marshall v. Colvin*, No. 12-

cv-6401 (T), 2013 WL 5878112, at *9 (W.D.N.Y. Oct. 30, 2013).  While "it is not *per se* error for

an ALJ to make a disability determination without having sought the opinion of the claimant's

treating physician, a decision not to remand assumes that there are no obvious gaps in the

record precluding the ALJ from properly assessing the claimant's residual functional capacity."

*Newton v. Berryhill*, No. 18-cv-1244 (MPS), 2019 WL 4686594, at *2 (D. Conn. Sept. 26, 2019)

(quoting *Downes v. Colvin*, No. 14-cv-7147 (JLC), 2015 WL 4481088, at *15 (S.D.N.Y. July 22,

2015)).

24

This duty is a threshold issue.  Accordingly, "the court must first be satisfied that the ALJ provided plaintiff with a full hearing under the Secretary's regulations and also fully and completely developed the administrative record." *Intonato v. Colvin*, No. 13-cv- 3426 (JLC), 2014 WL 3893288, at *8 (S.D.N.Y. Aug. 7, 2014) (*quoting Scott v. Astrue,* No. 09-cv-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010)).  Remand is appropriate when the ALJ fails to discharge this duty.  *See, e.g.*, *Newton*, 2019 WL 4686594, at *2; *Shafer*, 2018 WL 4233812, at *7-8; *Marshall*, 2013 WL 5878112, at *9; *Beller v. Astrue*, No. 12-cv-5112 (VB), 2013 WL 2452168, at *18 (S.D.N.Y. June 5, 2013).  But remand may be inappropriate, even if an ALJ fails to request a functional assessment from a treating physician, if "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity," rendering the failure harmless.  *See Newton*, 2019 WL 4686594, at *2 (quoting *Tankisi v. Comm'r Soc. Sec.*, 521 Fed. App'x 29, 34 (2d Cir. 2013)).  Thus, if any obvious gap in the record exists, and that gap could be addressed by seeking a functional assessment from a treating physician, a court should remand the matter back to the ALJ.

## II.    *Analysis*

This Court begins with the ALJ's affirmative duty to develop the record, which is a threshold issue.  Plaintiff argues that the ALJ failed to properly develop the record for two reasons:  (1) Dr. Figueroa, the consultative examiner ("CE"), failed to provide a sufficient RFC analysis, leaving the ALJ without a proper medical basis to ground his RFC in, and (2) the ALJ should have sought medical source opinions (i.e. RFCs) from Plaintiff's treating physicians or

from a medical expert to otherwise support his RFC.[16]  The Commissioner replies that, under

applicable rules and regulations, Dr. Figueroa's assessment of Plaintiff was sufficient, and as

such, there are no obvious records in the gap that render the record incomplete.  Plaintiff

additionally argues, for reasons similar to (2) above, but based on sufficiency of the record, that

the ALJ did not properly analyze whether the combination of Plaintiff's impairments equaled a

Listing.  Because the Court finds that there were gaps in the record created by Dr. Figueroa's

assessment, there was an absence of functional assessments from Plaintiff's treating

physicians, and the ALJ failed to fully consider the proper Listings at step four, the Court vacates

the decision of the Commissioner and remands this action back to the ALJ.

### A.   Whether the ALJ Satisfied His Duty to Develop the Record.

The first reason Plaintiff contends the ALJ failed to properly develop the record is

because the "CE examiner did not provide a true residual functional capacity evaluation."  (JS at

36.)  Plaintiff argues that the CE should have expressed an opinion about "what claimant can

still do despite her impairments."  (*Id.*)  In the absence of an analysis including such opinions,

Plaintiff argues, a gap in the record exists.

Courts in this Circuit have held on multiple occasions that remand is required when ALJs

fail to satisfy their duty to develop the record by having a record with the only functional

assessment coming from a CE after a single examination and failing to request (and receive) a

---

[16] Plaintiff argues that SSR 96-6p—which addressed the necessity to seek testimony from a medical examiner in certain scenarios regarding impairments that medically equivalent another Listing—applies because Plaintiff's application was filed prior to SSR 17-2p's effective date of March 27, 2017.  However, the ALJ's decision was issued on August 22, 2017—after the effective date of the regulation—which means that the new regulation applies.  *See Lowry v. Astrue*, 474 F. App'x 801, 804 n.2 (2d Cir. 2012) (noting that the court would "apply and reference the version of the [regulation] in effect when the ALJ adjudicated [the] disability claim").

functional assessment from the treating physician(s).  *See, e.g.*, *Newton*, 2019 WL 4686594, at

*2 (remanding on failure to develop the record when there were no functional assessments

from any treating physician and the ALJ relied solely on a CE's single examination of plaintiff,

which occurred two years before the medical record ends); *Shafer*, 2018 WL 4233812, at *7-8

(remanding on failure to develop the record when there were no functional assessment from

any physicians, including plaintiff's treating physicians, and three CE reports that the court

deemed insufficient functional assessments:  one CE was not physician, another only examined

plaintiff once, and a third did not support the ALJ's conclusion); *Marshall*, 2013 WL 5878112, at

*9 (remanding on failure to develop the record when there were no functional assessments

from plaintiff's treating physicians and the ALJ credited a physician and a CE, both of whom

only examined plaintiff once); *Beller*, 2013 WL 2452168, at *18 (remanding on failure to

develop the record when there were no functional assessments from plaintiff's treating

physicians and ALJ credited single-examination medical examiner and single-examination CE,

both of whom conducted their examinations before the Social Security Administration received

all of plaintiff's medical files).

   This case involves the same failure to develop the record.  The CE, Dr. Figueroa,

performed a consultative examination of Plaintiff on June 5, 2015.  This was the only time Dr.

Figueroa examined Plaintiff.  Dr. Figueroa observed that Plaintiff "has a marked limitation for

repetitive kneeling, squatting, and crawling . . . mild limitation for pushing and pulling . . . [and]

moderate limitation for lifting, carrying, and repetitive bending."  (Tr. 651.)  These limitations

seem to have come from Dr. Figueroa's observations of Plaintiff's "decreased range of motion

of the cervical spine, lumbar spine, left shoulder, right knee, and left knee."  (Tr. 23.)  But, Dr.

Figueroa did not explain how the decreased range of motion resulted in an assessment of marked, moderate, or mild limitations or what "marked," "moderate," or "mild" means in terms of what Plaintiff can still do despite these limitations. Yet, the ALJ based his decision to deny benefits on Dr. Figueroa's one-time examination and vague statements as to Plaintiff's functional capacity without every seeking information from Plaintiff's treating physicians about her functional capacity. Courts within the Second Circuit have found remand appropriate when an ALJ bases an RFC evaluation on general conclusions of a CE using vague terms such as "moderate" and "mild." *See, e.g.*, *McGill v. Colvin*, No. 14-cv-0601 (LEK) (CFH), 2014 WL 2779232, at *10 (N.D.N.Y. June 19, 2014) (holding a single-examination CE's report containing "restrictive analysis and opinion that plaintiff has 'marked' limitations in her ability to perform work related functions" to be insufficient); *Karabinas v. Colvin*, No. 12-cv-6578 (MAT), 2014 WL 1600455, at *11 (W.D.N.Y. April 21, 2014) ("While the opinions of treating or consulting physicians need not be reduced to any particular formula, the consultative examiner's use of the term 'moderate', without additional information, does not permit the ALJ . . . to make the necessary inference that [Plaintiff] can perform the exertional requirements . . . of light work.").

Plaintiff's treating physicians include, at a minimum, Dr. Sanz, who treated Plaintiff on no fewer than twelve occasions over sixty-two months; Dr. Cuartas, who treated Plaintiff no fewer than six times over sixty-six months; and Del Savio, who treated Plaintiff no fewer than four times over twenty-five months. However, none provided an opinion about Plaintiff's functional abilities or limitations, and the ALJ did not request them in seeking to develop the record. Statements of whole or partial disability for purposes of a workers' compensation decision are not binding on the Commissioner, who evaluates disability based on a different

standard.  However, the ALJ may not ignore treating physicians' medical findings simply

because they also provided an opinion of disability for workers' compensation purposes.  *See*

*Perozzi v. Berryhill*, 287 F. Supp. 3d 471, 492 (S.D.N.Y. 2018); *Mercado v. Colvin*, No. 15-cv-2283

(JCF), 2016 WL 3866587, at *15 (S.D.N.Y. July 13, 2016) (a doctor's role in a claimant's workers'

compensation case "is a legally insufficient reason to categorically disregard a treating

physician's opinion").  To the extent the ALJ is lacking an assessment from the treating

physicians about the Plaintiff's functional limitations, the ALJ has a duty to reach out and

further develop the record.  *See, e.g.*, *Newton*, 2019 WL 4686594, at *2 (D. Conn. Sept. 26,

2019) (remanding due to ALJ's failure to develop the record); *Shafer*, 2018 WL 4233812, at *7-8

(same); *Marshall*, 2013 WL 5878112, at *9 (same); *Beller*, 2013 WL 2452168, at *18 (same).

The Commissioner cites this Court's decision from *Jordan v. Comm'r of Soc. Sec.*, No. 16-

cv-9634 (KHP), 2018 WL 1388527, at *9-10 (S.D.N.Y. Mar. 19, 2018), *appeal dismissed* (Nov. 9,

2018), to argue the vague phrases from Dr. Figueroa's report do not render her functional

assessment insufficient.  There, this Court considered whether the ALJ gave the appropriate

weight to the CE given the CE's use of the phrase "moderate limitations."  As an initial

observation, while the CE in *Jordan* used this single, vague phrase, Dr. Figueroa used three

equally vague phrases:  "marked," "mild," and "moderate."  Moreover, in *Jordan*, there were

no "marked" limitations at all; there was only a "moderate limitation for general activity due to

palpitations secondary to atrial fibrillation," and the ALJ found light work possible.  *See id.* at *4.

Here, while the ALJ acknowledged the CE's "marked" limitations for kneeling, squatting, and

crawling, and "moderate" limitations for lifting, carrying, and repetitive bending, the ALJ still

nonetheless found that Plaintiff was capable of light work.

29

Further, this Court noted in *Jordan* that the ALJ's failure to seek a functional assessment from a treating physician did not require remand because "the RFC determination is otherwise supported by the treating doctors' or a consultative examiner's clinical findings, and the ALJ has a complete record from the treating doctors." *Id.* at *10. However, this is not true in the instant case, where only a single functional assessment exists in the medical record, that functional assessment is from a one-time examination by a CE, and the CE's report is inconsistent with the treating doctors' clinical findings. For example, Dr. Figueroa noted limitations that necessarily involve leg and back movements (i.e. kneeling, squatting, crawling, carrying, and repetitive bending) that would have required Dr. Figueroa to consider Plaintiff's gait, which she described as "normal." (Tr. 649.) This is in direct contradiction with medical reports from treating physicians, both before and after the June 2015 consultative examination, that indicate Plaintiff had an antalgic gait. (*See, e.g.*, Tr. 279, 544, 682 (three separate Dr. Sanz reports, two from before the consultative examination and one after, all indicating antalgic gaits); Tr. 596 (Dr. Del Savio February 2015 examination notes indicating abnormal gait and station and instructing Plaintiff not to work for the next eight weeks until her next follow up).)[17] It also would have required Dr. Figueroa to consider Plaintiff's back condition—for which Dr. Figueroa rendered "[c]hronic back pain" and "[l]umbar radiculopathy" diagnoses—that also seem to be contravened by a treating physician. That is, after ordering an MRI, Dr. Cuartas' February 2015 examination report (which was the last examination before the CE examination

---

[17] While the Court makes no finding as to whether Dr. McClaughlin should be considered a treating source, the Court does note that Dr. Figueroa's consultative examination happened only three weeks before Plaintiff's knee replacement surgery. While Dr. Figueroa mentions this fact, she makes no attempts to reconcile her functional assessments, that necessarily would involve Plaintiff's knee, with the fact of Plaintiff's upcoming surgery. (Tr. 647-51.)

in June 2015), indicates Plaintiff had the following conditions:  degenerative disc and facet joint changes of the lower lumbar spines, annular tear and disc bulge at L4-L5 with facet arthropathy and ligamentum hypertrophy causing cervical canal stenosis and mild bilateral neural foraminal narrowing, as well as a small disc bulge at L5-S1 without spinal stenosis.  (Tr. 690.) Dr. Figueroa's report does not provide enough information to fill the gaps created by the contradictions between her CE report and at least three of Plaintiff's treating sources.

As a second example, with respect to Plaintiff's hands and wrists, Dr. Figueroa diagnosed Plaintiff with "[b]ilateral carpal tunnel syndrome, status post surgery," yet does not include any limitations regarding Plaintiff's hands—unless "mild limitation for pushing and pulling" was intended to address the carpal tunnel, in which case, the insufficiency of the functional assessment becomes obvious.  (Tr. 651.)  Again, the medical reports from a treating physician, this time Dr. Del Savio, indicate potentially more serious impairments with Plaintiff's hands and wrists than Dr. Figueroa acknowledges.  (*See, e.g.*, Tr. 345, 643 (Dr. Del Savio's December 23015 examination of Plaintiff resulted in Plaintiff testing positive in three separate hand/wrist tests and Dr. Del Savio ordering additional testing, which then revealed mild bilateral carpal tunnel syndrome and mild right cubital tunnel syndrome).)  When an ALJ has only treatment records and a vague functional capacity assessment from a single-examination CE, especially when that functional assessment seems at odds with a litany of notes from treating physicians, the ALJ "ha[s] an affirmative duty to develop the record and request that Plaintiff's treating physicians assess her RFC."  *Marshall*, 2013 WL 5878112 at *9.  The ALJ did not do that here, and as a result, he did not satisfy this duty.

### B.  *Whether the ALJ Satisfied the Treating Physician Rule.*

The treating physician rule is intertwined or dovetails with the ALJ's affirmative duty to develop the record.  In *Burgess v. Astrue*, the Second Circuit set forth the ALJ's obligation when evaluating whether to give a treating physician's opinion controlling weight in accordance with the so-called "treating physician rule."  537 F.3d 117 (2d Cir. 2008).  These factors include:  "[1] the [l]ength of the treatment relationship and the frequency of examination; [2] the [n]ature and extent of the treatment relationship; [3] the relevant evidence . . . , particularly medical signs and laboratory findings, supporting the opinion; [4] the consistency of the opinion with the record as a whole; and [5] whether the physician is a specialist in the area covering the particular medical issues."  *Id.* at 129 (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii), (3)-(5)) (internal quotation mark removed)*; see also Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019).  The Second Circuit further noted that "[g]enerally, the longer a treating source has treated [the claimant] and the more times [the claimant] ha[s] been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion."  *Burgess,* 537 F.3d at 129.  Under *Burgess*, if these factors are not explicitly applied and discussed by the ALJ, remand will be appropriate unless the ALJ has elsewhere in the opinion provided "good reason" for the weight given to the treating physician, or, a "searching review of the record" by a reviewing court satisfies the court that the "substance of the treating physician rule was not traversed."  *Estrella*, 925 F.3d at 96.  If an ALJ fails to develop the record, the ALJ will not be able to properly apply the treating physician's rule.  *See Shafer*, 2018 WL 4233812, at *10 (quoting *Barrie on behalf of F.T. v. Berryhill*, No. 16-cv-5150 (CS) (JCM), 2017 WL 2560013, at *10 (S.D.N.Y. June 12, 2017)).  As noted above, the fact that a treating physician previously treated the plaintiff in

the workers' compensation context cannot suffice as a sole reason to give little or no weight to a treating physician. *See Perozzi*, 287 F. Supp. 3d at 492; *Mercado*, 2016 WL 3866587, at *15 (a doctor's role in a claimant's workers' compensation case "is a legally insufficient reason to categorically disregard a treating physician's opinion"). This is true regardless of the differing standards between disability in the workers' compensation context and the social security context, and regardless of the fact that the opinions may overlap with the ultimate issue, which is reserved for the Commissioner's decision. *See, e.g.*, *Velez v. Berryhill*, No. 18-cv-8603 (PGG) (KNF), 2020 WL 2950973, at *7-8 (S.D.N.Y. Feb. 24, 2020) (holding that ALJ erred in giving more weight to a single-visit CE than to a treating physician who rendered a disability determination in the workers' compensation context, and holding that the *Burgess* factors should be applied to both to appropriately consider the disparate relations of the doctors with the plaintiff), *report and recommendation adopted*, 2020 WL 1467183 (S.D.N.Y. Mar. 26, 2020).

Here, the ALJ gave a boilerplate recitation of the *Burgess* factors and stated that they were fully considered when assigning "some" weight to Plaintiff's treating physicians' opinions. (Tr. 23.) He then explained, "opinions regarding the extent of the claimant's total disability impairment are entitled to no evidentiary weight" because their workers' compensation context leaves these opinions with "no probative value." (Tr. 23.)[18] Next, the ALJ noted that disability was defined differently between workers' compensation and social security statutory and administrative schemes. (Tr. 23.) And finally, the ALJ noted that whether the claimant is disabled is a determination reserved to the Commissioner. (Tr. 23.) While the ALJ set these out

---

[18] It is unclear what the ALJ intended to distinguish, as the opinions regarding the workers' compensation disability given by those treating physicians are effectively the entirety of their opinions.

as three separate reasons to support the limited deference he gave the treating physicians'
opinions, these three reasons are really the same:  the workers' compensation context of the
treating physician opinions renders them valueless.

This analysis falls well short of satisfying the treating physician rule, particularly in light
of the tension between the treating physicians' opinions and examination findings and the
medical findings of the CE.  The ALJ did not discuss how the medical findings and test results of
the treating doctors over time are undermined by the findings of the CE or contrary to the
treating doctors' own statements about Plaintiff's inability to function in her old job.  He did
not discuss how the medical findings of Plaintiff's treating doctors are consistent or
inconsistent with Plaintiff's self-reported physical limitations and daily functioning.  He utterly
failed to mention the various specialties of the OSMPC doctors Plaintiff saw over six years.  The
ALJ does not seem to have reached out to a single one of those OSMPC doctors in an attempt
to develop the record.  This is a major reason why the ALJ was unable to adequately analyze
and discuss how the treating physicians' opinions bear on Plaintiff's functional capacity.
Remand is also needed for this reason.

### C.   Whether the ALJ Sufficiently Considered the Alleged Listings at Step Four.

Plaintiff also complains that the ALJ failed to discuss Listing 1.04 related to spinal issues.
The Plaintiff's application for disability benefits expressly listed back conditions as a disabling
condition, later specifying to the ALJ that the back issues were spinal in nature.  (Tr. 230, 268
("Also, she has L4-5 lumbar spine herniation, stenosis and nerve impingement . . . .").)  The
medical evidence demonstrated at least four spinal conditions:  (1) spinal stenosis of lumbar
region, (2) lumbago, (3) displacement of lumbar disc without myelopathy, and (4) cervical

34

intervertebral disc degeneration.  (Tr. 271 (Dr. Sanz's Workers' Compensation Doctor's Narrative Report, dated September 26, 2014, indicating the four diagnoses)); (*see also* Tr. 317 (Dr. Cuartas' Workers' Compensation Doctor's Narrative Report, dated August 22, 2011, showing diagnoses for (1) and (3), and a lumbar diagnosis (ICD9 Code 847.2, compared with lumbago ICD9 Code 724.2)), 648-50 (Dr. Figueroa's June 5, 2015 CE report, which noted Plaintiff's severe reported back pain and described in musculoskeletal section the limited cervical spine range of motion).)  Yet, the ALJ did not address this listing at all.  Remand is also appropriate because the ALJ failed to address this listing.  *See Bogardus-Fry v. Astrue*, No. 11-cv-0883 (MAD), 2012 WL 3779132, at *4-5 (N.D.N.Y. Aug. 31, 2012) (Remanding due to ALJ's failure to discuss the evidence surrounding plaintiff's claimed Listing 1.04A at step four, even when ALJ mentioned certain issues with plaintiff's spine elsewhere in the opinion).

## CONCLUSION

For the above reasons, the Court finds that the ALJ failed to properly develop the record, failed to satisfy the treating physicians' rule, and failed to address an applicable Listing. As a result, pursuant to sentence four of 42 U.S.C. § 405(g), remand to the Commissioner of Social Security for further administrative proceedings is appropriate, and the Court does not reach the remaining arguments of the parties.  As such, Plaintiff's motion is GRANTED, and the Commissioner's motion is DENIED.

SO ORDERED.

Dated: June 23, 2020
         New York, New York

KATHARINE H. PARKER
United States Magistrate Judge